**Ella M. MULLER, Plaintiff,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education & Welfare, Defendant.**

United States District Court
S. D. New York.
July 29, 1963.

John B. Griffin, New York City, for plaintiff; Edwin S. Shapiro, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, for defendant; Anthony J. D'Auria, New York City, of counsel.

COOPER, District Judge.

Pursuant to Title 42 U.S.C. § 405(g), plaintiff brings this motion for judgment on the pleadings. The cross motion seeks the same relief. Involved is a review of the final decision by the Secretary of Health, Education and Welfare denying plaintiff's application for child disability insurance benefits under Sec. 202(d) of the Social Security Act.

The paramount issue presented: Has plaintiff been continuously "disabled" as defined in the Act, 42 U.S.C. § 416(i) wherein disability means " * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

## PRIOR PROCEEDINGS

Plaintiff, born September 2, 1901, filed application for child disability insurance benefits on January 9, 1959 (243–6 Transcript of the Administrative Record, made part of the pleadings). In it she alleged she became unable to work in 1927 because of a mental impairment.

That application was denied and after reconsideration by a separate Bureau, lawfully empowered to proceed, it was again denied (Tr. 260–4, 283–9). The matter then came on before a hearing examiner who considered the case *de novo* and disallowed her claim (Tr. 122–131). Thereafter (on July 13, 1961) the Appeals Council reviewed the proceedings before the hearing examiner, held a hearing of its own at which further testimony was adduced and additional exhibits received in evidence, and on August 27, 1962 affirmed the denial of plaintiff's claim (Tr. 5–13). That determination was adopted by the Secretary of Health, Education and Welfare.

## JUDICIAL REVIEW

■ A judicial review of the final decision of the Secretary is provided by Sec. 205(g) of the Act which includes, "The findings of the Secretary as to any fact, if supported by substantial evidence shall be conclusive." Thus this judicial review is not a trial *de novo*. As emphasized in Carqueville v. Flemming, 263 F.2d 875, 877 (7th Cir. 1959), " * * * the function of the District Court was to review the record to determine whether it contained substantial evidence to support the administrative decision. Neither we nor the District Court have the right to make our own appraisal of the evidence." And Adams v. Flemming, 276 F.2d 901, 903 (2d Cir. 1960) held, "The findings of the Social Security Agency are final and binding if there is a substantial basis for them. Such finality extends to inferences and conclusions drawn from the evidence."

■ While judicial interference under these circumstances should be with the greatest reluctance therefore, the interests of justice compel the conclusion that the final determination of the Secretary disallowing plaintiff's claim is not supported by "substantial evidence."

## MEDICAL STATEMENTS

Although regarding as impressive the written medical statements relating to plaintiff's mental aberration during periods subsequent to her eighteenth birthday, the Secretary (and all who participated in the matter before it reached his hands) emphasized, as the sole deficiency in the case, the lack of medical conclusions pertaining to her mental condition prior to that birth date—concededly a crucial date in this determination.

It should be observed that the hearing examiner was "willing to assume that claimant at this time, including time of filing, is disabled within the meaning of the Social Security Act, and unable to perform substantial gainful work on any regular basis." And referring to the "medical testimony" he concluded, "None of it establishes onset of disability prior to age 18. On the contrary onset at about age 27 when her first baby died is corroborated. The only impairment prior to 18 even suggested is nervousness and perhaps general maladjustment" (Tr. 125). The Appeals Council, however, recorded, "Therefore, even at the present time there would still seem to be a considerable question as to whether the claimant has a severe psychiatric impairment" (Tr. 13).

Succinct though the medical statements are (pointing up a clear need for amplification), they are highly significant.

(a) Dr. Leavitt's statement of January 29, 1959 (Tr. 254): He had her under treatment in 1928 for "post-partum neurosis manic-depressive type." On February 9, 1961, he wrote (Tr. 303):

"The only office record that I have of this patient goes way back to August 25, 1928, and my office record of Mrs. McCann, as was her name at that time, indicates that 'since the death of her one and only baby some months ago she had become more depressed and sleepless, irritated and restless, and unable to pay attention and worries constantly that she is losing her mind.' No information was given to me at that time, according to my records, that such a condition had existed prior to

the present attack. Of course, there may have been previous attacks, of which I was not informed. So, my answers to the questions were that the onset of the illness for which I treated her in August, 1928, was 'some months ago.'

"The tentative diagnosis made at that time 'post-puerperal psychosis of the manic depressive type.' Such a type of psychosis is one that tends to recur but does not inevitably recur. One might compare it to a person who is predisposed to having severe influenzal attacks. He has one attack, gets over it, and may not necessarily have any more attacks but he is predisposed to such a recurrence."

(b) Dr. Stillman on February 29, 1959 declared (Tr. 250):

"She has suffered from a manic-depressive psychosis for many years. At this time she has episodes of depression and is not employable."

(c) Dr. Healey on August 20, 1955 (Tr. 302):

" * * * the claimant was suffering the disabling effects of manic depressive psychosis and that because of her failure to understand the nature of her own condition the prognosis was poor."

(d) Dr. Healey on February 6, 1962 affirmed a statement (Tr. 360) that he

"went into her background, found her unusually closely attached to the memory of her father, and in an extremely nervous and depressive state."

(e) Dr. Bricker in a hand-written note received by the Department of Welfare, Bureau of Disability Determinations, on January 7, 1960 (Tr. 272) responded to a written inquiry by claimant's son. The inquiry read:

" * * * stating simply that you have known the claimant and her family since 1915 and as a neighbor in the community have heard of or have observed from time to time the results of serious mental disability."

The doctor's response thereto:

"Although I did not treat Mrs. Ella M. Botting psychiatrically, I did treat her medically from time to time. I recall definitely that she was not mentally stable."

(f) On February 19, 1961, Dr. Bricker wrote concerning plaintiff (Tr. 322):

"I had known the family since about 1920. Regarding Mrs. Muller, Mr. Botting was very much concerned. He realized she was not a normal person. She was very immature, even up to the time of her marriage. Although I did not treat her psychiatrically, my observation was that she was very peculiar and was almost moronic in her mental development. She had a very silly manner of conversing. Mr. Botting was so concerned about her that he told me that he was making provisions for controlling his estate because she would not be able to mentally take care of it. Whether he did or not I do not know. I am seventy-three years of age and have been practicing medicine and surgery since 1914."

(g) Dr. Margaretten on February 20, 1960 reported to the Department (Tr. 279):

"She gave the impression of an inadequate, dependent, immature personality who is aware of her maladjustment gives inconveniences as reasons for her failures. * * * I conclude that this patient presents a psychoneurotic reaction, hysterical in nature, in an inadequate, immature, dependent personality unadjusted. I do not know what remedial measure would satisfy her to any extent

other than provision of her economic and emotional needs."

(h) Central Islip State Hospital: Claimant was admitted there March 15, 1959 on a petition signed by her only living child (the other two are deceased), an attorney who represented her throughout the proceedings leading to the Secretary's decision. His petition stated that claimant "had a history of manic-depressive psychosis for many years." Three weeks later she was discharged "Without Mental Disorder, Emotional Instability" (Tr. 8).

The Advisory Council underestimated the full import of the statements by Dr. Bricker. He knew claimant before she was eighteen. As to plaintiff's mental state at that age, he went further than the Advisory Council's estimate that he "considered her very immature even up to the time of her first marriage. He further stated that although he did not treat her from a psychiatric standpoint, he observed that she was very peculiar, had a silly manner of conversing and was almost moronic in her mental development." (Tr. 8, 9). As noted hereinabove, it was his unequivocal comment, "I recall definitely that she was not mentally stable" (Tr. 272).

Not commented on in the record is Dr. Bricker's revelation that he well remembers claimant and her family, had frequent talks with her father about her, and that her father told him she was not "a normal person" (Tr. 272, 322). These conversations and observations by Dr. Bricker undoubtedly were included by him as part of his subjective findings.

The Advisory Council was unimpressed with the statements noted above of Doctors Healey and Stillman that claimant was suffering from a manic-depressive psychosis (Tr. 13). Their examinations were conducted, so held the Advisory Council, "35 years after her eighteenth birthday * * *"; that Dr. Stillman failed to "show the basis" for his observation "that her condition had been present for 'many years'" (Tr. 13). The Council made no allowance for the subjective and objective medical findings which might very well account for Dr. Stillman's medical conclusion. Further, the Council found additional fault with him (Tr. 13): (a) his statement "in all probability it was based primarily on the history provided by the claimant's representative and the claimant" and (b) "it becomes significant that the sole purpose of this visit was apparently to obtain a medical report to establish that the claimant was disabled for social security purposes." As to (a): It is precisely such information that forms a part of the total medical findings and on which medical conclusions are predicated. As to (b): The gathering of portions of total proof available in support of a claim often takes place after its assertion.

### DR. MARGARETTEN

There is a sharp contrast between the appraisal by Dr. Margaretten and the hearing examiner as to their respective impressions gleaned from face-to-face talks with claimant. On February 21, 1961 the hearing examiner found her (Tr. 124, 9):

"Moreover, claimant herself appeared at the hearing, accompanied by her son, and testified in a very satisfactory way. She was altogether responsive to questions put to her by the hearing examiner. She had a good memory for dates. She seemed completely composed and at ease while testifying, being in the witness chair for well over an hour. Her answers related to the various portions of her life which are relevant in this case, covering elementary school, high school, her two marriages, and also some subsequent work.

"She appears to be an altogether well nourished individual, although her well rounded face has an unusually blank expression. * * *

"As already indicated in this decision, claimant at the hearing pre-

sented a truly composed appearance, and answered responsively."

The day previous, Dr. Margaretten officially reported (Tr. 279):

"Ella Muller was to see me this afternoon accompanied by her son. She gave her story in a vague childish manner with digressions to details in an exaggerated form. It was therefore difficult to obtain a chronological story. She seemed to be certain of dates, places and people but the events she mixed up in a desultory way, a constant gibberish, unmeaningful unsolicited material."

## PLAINTIFF'S MOTHER

Aside from noting the claimant's mother was a constant alcoholic, no particular significance is attached thereto (Tr. 7,203). From many sources, medical and lay, there is support for Dr. Bricker's conclusion that she was a "chronic inebriate." Certainly the effect, if any, of the mother's behavior during plaintiff's formative years, and in light of the entire record, should have been considered, weighed and dealt with in positive fashion.

## LAY WITNESSES

Without justification the lay witnesses were given short shrift. The hearing examiner regarded them indulgently (Tr. 130):

"Although the hearing examiner has reviewed at great length the non-medical evidence he has done so mostly out of deference to the great amount to time and energy that must have been put into accumulating it by claimant's son. Actually it is the medical evidence which is basic in determining a question of disability, and, as already noted, Dr. Margaretten's rather recent evaluation indicates that even up to the present time claimant is only a borderline case in terms of disability. There is nothing in any of the other medical evidence in this case which can establish disability, at least not as of a time prior to age 18."

The Advisory Council thought little better of them, but for different reasons, principally two inconclusive "inconsistencies," and "most of the persons submitting statements are either relatives (by blood or marriage) or individuals whom the claimant's representative has described as 'long friends' of the family" (Tr. 11). In view of the Advisory Council's observation that "these comments are not intended to impugn the veracity of the individuals who have submitted these statements" (Tr. 11), it must be noted (a) such persons were the very ones who had the best opportunity to observe intimately claimant's behavior pattern as it developed before and after her eighteenth birthday, and (b) each was a reluctant witness (Tr. 204–210, 286).

Extracts from statements made in 1961 by some of these lay witnesses follow:

From persons who are not "relatives":

(a) A former school teacher (Tr. 286):

"I have been loath to comply because of many reasons. I'll mention two of them. * * *

"(1) As a layman, my opinion has little basis other than observation.

"(2) If my appraisal of Mrs. Muller were known to her, I might be annoyed with telephone calls or otherwise harassed. However, when I recall the forty years that I have known this woman, I am constrained to say that at no time have I ever considered her emotionally able to hold down any sort of job."

(b) A childhood friend who knew the Botting (Claimant's maiden name) family (Tr. 351, 2):

"Our family met the Botting family in the autumn of 1915. Our homes were on opposite corners and Mr. Botting and my father became friends.

"These are my recollections:

"She had no friends who visited her after she left school.

"Every place she went she was with her mother and their outings were rare.

"Marjorie never ran an errand. The neighborhood children got a dime for going.

"Mrs. Botting and Marjorie often spent the day or most of it in bed. If they got up before noon they prattled around in night clothes until it was time for Mr. Botting to get home.

"Marjorie never had a boy friend until she met Paul McCann, through Mr. Botting.

"She always dressed older than a girl her age with lots of black and much glamour.

"Come to think of it, I never saw Marjorie in a house dress or casual clothing.

"When both Marjorie and Mrs. Botting were difficult, Mr. Botting retreated to his workshop. My father often went over and I did also.

"Marjorie talked on and on about nothing, only her mother could shut her up.

"During a temper tantrum Marjorie threatened her mother so loudly, we could hear it across the street in our house. However, no matter how she carried on, she could always get her father on her side.

"When I was ten and Marjorie twenty, I felt the older. Even then I sensed she was peculiar.

"In my honest opinion Marjorie never grew up. She told me she never read one book in her life. She laughed about it.

"At twenty-four Marjorie was not ready for marriage. We at home sympathized with Paul, her first husband. The tragedies of their marriage brushed off Marjorie but left Paul a broken man.

"I went to Philadelphia General Hospital with Marjorie when Paul was dying. Marjorie worried where we could get a cup of coffee.

"I never saw her cry or show the slightest emotion when Paul died or during the services for him. However, she was near hysteria at the *thought* of her father's death."

(c) A friend and neighbor during the period 1927–1942 (Tr. 355, 7):

"The Bottings were our neighbors at the time I was born, but my observations cover approximately a 15-year period, from 1927 to 1942, at which time they left the neighborhood.

"Mrs. Muller as I knew her, was an individual who never attained a full degree of mental or emotional maturity. She remained, literally, a child, despite two marriages and the experience of motherhood. She apparently never developed the desire of normal individuals to strive for independence, nor to accept the responsibilities and obligations of life which most of us take for granted. Despite parental prodding, she never attempted to acquire any particular skills or knowledge which would enable her to be self-supporting. It is my opinion that a woman of Ella's mental and emotional makeup was certainly never suitable for even unskilled work on a commercial basis. Eight hours a day of careful, dependable service would not be possible for her. She was too nervous, excitable and procrastinating in her dealings with people and things.

"Ella's mental instability obviously caused her parents concern for her future as a reasonable individual, as well as for her economic future. Her father was not

an affluent man, and expressed concern for his daughter's welfare on many occasions.

"The pertinent fact of Ella's two marriages, I think, is that her father 'engineered' them, in so far as he introduced her to the two men involved.

"Left to her own resources, I doubt very much that Ella would have married at all. She just did not seem to have any desire to associate with her contemporaries. She was apparently content to be with older people, her parents friends.

"Marriage did not seem to affect the mental and emotional growth which usually occurs in young wives and mothers. After the accidental death of her baby, though she was honestly sad about it, she did not seem to be deeply moved by the tragic aspects of her loss.

"Some time later, her husband's health failed, and he was placed on the critical list at the hospital. Even during this crisis, Ella's childlike attitude was still apparent. She did not fully realize her responsibilities and obligations to her husband. For example, I offered every day to take care of her new baby, so she could visit the hospital. She kept coming back hour after hour, day after day, each time appearing at the door in her negligee. I never did succeed in getting her to the hospital—It was too late. Her husband passed away. I was fifteen years old at the time, and yet even then I felt and acted even more mature than Ella, a grown woman, a wife, a mother.

"After her husband's death, once again Ella shyed away from her responsibilities and settled down in her father's home with her baby. The haphazard way in which she ran the household and cared for her child again reflected her emotional and mental instability, her excitability and extreme nervousness. To the casual onlooker, Ella might well have been accused of willful neglect, but those of us who knew her realized that she was trying, to the best of her ability, to be a good mother and efficient housekeeper for her father, who at this time was a widower. She just could not cope with the stress and strain of routine household and maternal responsibilities.

"Ella's life during the period I knew her, has followed the pattern of shying away from the responsibilities of normal living, which she was never able to handle efficiently. She wasn't lazy or indifferent about these things. In my opinion she was not mentally or emotionally capable of caring for herself or others."

(d) Another friend and neighbor (Tr. 344):

"The Botting family were neighbors of mine from (1914–1930) when I moved from my house at 4724 N. Marvine Street, they lived at the corner of Marvine and Wyoming Ave. Our family and the Botting's were good friends and I knew Marjorie well as that is the name we called her.

"Marjorie was about fourteen years old and even then showed signs of a nervous condition, as she became older it seemed to become more apparent. Her condition I attribute to her mother she never gave her a moments peace and was always after her and many times she had to meet her dates on street corners.

"Mrs. Clarke T. Botting had a bad temper and was highly emotional and very nervous and hard to get along with, I feel sure this had a lot to do with Marjorie being in this state of mind."

(e) One who knows claimant for more than 35 years (Tr. 308):

"I have known Ella Marjorie McCann Muller for over 35 years, and in my opinion, she has never been competent to provide a living for herself. She has always had a childish dependency on others for her livelihood. And not enough management to spend the money if she had of had it. She is in such poor emotional and mental condition that it is impossible for her to engage in any gainful occupation."

(f) About 1942 another neighbor observed (Tr. 333):

"I knew very little about her financial condition except for hearsay and what Mrs. McCann herself told me. She did mention several times that she was dependent upon her father for support. She was a highly nervous person and during the time that I knew her she was never employed."

(g) An American signal corps employee since 1935 who observed claimant in the period 1944–1952 (Tr. 325):

" * * * compulsive talker * * practically always in a state of excitement, about one thing or another * * * I do not understand how she could get a job, and if she did, how she could hold it due to the above characteristics. * * * "

From persons "related":

(h) Claimant's son, her representative at the hearings (Tr. 217, 8):
8):

"She could do these things intermittently, but she could not do them in a way that would satisfy anyone in the household. When I was growing up the dishes would remain * * * in the pan for days and weeks at a time and just a few would be washed off if need-ed * * * she will go about a piece of work in an excited way. If anything has to be done, a floor scrubbed or a bureau cleaned out, she will use excess energy to do it, maybe do a very fine job on some small part of it, but the rest of the home will be in an entire disarray and then that job won't be repeated again for far too long beyond any normal standard. The picture of her room right now * * * immediately before I left * * * there are four drawers that are jammed and packed with goods and you cannot separate and you cannot find anything."

(i) The lament of plaintiff's father to the family doctor before she attained her majority (Tr. 322):

"The father was very much concerned. He realized that she was not a normal person."

(j) Claimant married David P. McCann in 1924. He died in 1933, the year plaintiff's representative was born. He testified (Tr. 224):

" * * * my father protected her for a period of time, and he commented to all of these people that he knew that there was a mental defect. * * * "

(k) Claimant's sister-in-law (Tr. 345):

"Shortly after her marriage to my brother (Mr. Muller) I noted some very strange actions. For instance she would call the grocery store every morning and order the same items—eggs, bacon, butter, bread, milk, etc. The refrigerator was so full of unused food that it would spoil and had to be thrown out.

"She would put cakes and other food under the bed.

"One day when Mr. Muller returned from work he found the apartment empty—she had moved all the furniture to Philadelphia for storage.

"She would call on the phone incessantly and her conversation would be on the *same subject* over and over again until in desperation one would have to hang up.

"It became evident to us shortly after her marriage that she appeared to be mentally unbalanced."

(1) A brother of David P. McCann (Tr. 291):

"Through my acquaintance with the late Mr. Clark T. Botting, who was the father of Ella Marjorie Muller. On my numerous visits to Philadelphia and in conversation with Mr. Botting he advised me that his daughter had never been completely normal and was a constant care. And in my visit with him he stated this over and over again. That she had constantly been a care of his from childhood with the exception of a short period of time when she was married to David Paul McCann, now deceased, who was my brother."

Instead of disregarding their meaningful statements, much more credence and weight should have been accorded these lay witnesses. Their statements comprise pertinent observations made at first hand and have a direct bearing on the crucial problem presented for solution— "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration" 42 U.S.C. § 416(i).

## TESTIMONY BASED ON HYPOTHETICAL QUESTIONS

Dr. Margaretten who examined claimant in 1960 was at that time a Board-certified specialist in psychiatry and neurology (Tr. 8). His services in this case were obtained by defendant. Much more should have been sought from him than was actually elicited. His report (Tr. 279) relates to plaintiff's mental state as of the time of his examination. As already indicated herein, that particular information was made available by others. At least to Dr. Margaretten (the assistance of other medical experts would be most desirous), questions should have been propounded, based on the statements of the other medical observers and the statements of the lay witnesses, in a search to elicit his medical opinion of claimant's "disability" not only during the past three decades but prior to her eighteenth birthday.

Such hypothetical questions would help develop and determine the issue. Possibly it would enable those so questioned to consider the total evidence of claimant's mental impairment over the period subsequent to her eighteenth birthday, and, in conjunction with all the evidence of a similar nature prior thereto, relate it back to the earlier period. Whatever response this approach might develop, the record would reflect evidence of "disability" and "duration" of a much more determinative quality than now exists.

While the finders of fact would have the opportunity to accept or reject, in whole or in part, such medical conclusions, and the reasons on which they are predicated, it would indeed constitute a vital segment of testimony. It would bind up the loose fragments of relevant material, give the whole a fuller interpretation, and aid substantially in resolving an issue saturated with meaning to parties clearly intent upon dealing fairly.

## CONCLUSION

Justice can be served best by making it mandatory that the hearings be reopened to the end that proof in greater detail be obtained from the principal witnesses, medical and lay, including such additional witnesses as may be regarded meet and proper in the circumstances. While the burden of establishing the claim is clearly on the plaintiff, this Court entertains no doubt that both sides will lend a hand in this pursuit for the whole truth.

Pursuant to 42 U.S.C.A. § 405(g), the hearings are ordered re-opened to effectuate the objectives herein expressed and in no wise inconsistent with this opinion.

Plaintiff's motion is granted. Defendant's motion is denied.

This opinion includes the order; settlement thereof is unnecessary.